## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

LAMAR WILMINGTON (B-33084),    )
        )
       Petitioner,    )    Case No. 16-cv-3787
        )
   v.    )    Hon. Steven C. Seeger
        )
TARRY WILLIAMS, Warden,    )
        )
       Respondent.    )
_____)

## MEMORANDUM OPINION AND ORDER

Petitioner Lamar Wilmington, a prisoner at the Dixon Correctional Center, brings this habeas corpus action under 28 U.S.C. § 2254 to challenge his 2007 state-court convictions for first-degree murder and concealment of a homicidal death. *See* Petition for Writ of Habeas Corpus (Dckt. No. 1). For the reasons stated below, this Court denies the petition on the merits and declines to issue a certificate of appealability.

### Background

The Court draws the following factual history from the state court record. *See* State Ct. Record (Dckt. No. 54). The state court's factual findings are presumed correct unless Petitioner rebuts this presumption by clear and convincing evidence. *See Hartsfield v. Dorethy*, 949 F.3d 307, 309 n.1 (7th Cir. 2020) (citing 28 U.S.C. § 2254(e)(1); *Perez-Gonzalez v. Lashbrook*, 904 F.3d 557, 562 (7th Cir. 2018)). Petitioner has not made any such showing.

#### *Factual Background and Trial*

This case is about a fatal shooting and the concealment of the victim's body. On March 4, 2004, Guan McWilliams's body was found in a garbage can in an alley in the Greater Grand Crossing neighborhood in Chicago. *See People v. Wilmington*, 983 N.E.2d 1015, 1017, 1019

(Ill. 2013). An autopsy revealed that McWilliams had been shot twice in the top of the head. *Id.*

A week after the murder, Petitioner Lamar Wilmington went to the Chicago Police Department to report information about McWilliams's death. *Id.* He told detectives that he overheard a man known as "Dollar" say that he killed a man and threw him in the garbage. *Id.* Detective Gerald Hamilton interviewed Dollar but ruled him out as a suspect. *Id.*; State Ct. Record (Dckt. No. 54-35, at 37–38).

Three months later, Petitioner again appeared at the police station, this time to report that a bullet had grazed his head. *See Wilmington*, 983 N.E.2d at 1017–18. Detective Hamilton investigated Petitioner's complaint through the evening and into the early morning hours the next day, locating and speaking with various witnesses. *See* State Ct. Record (Dckt. No. 54-35, at 38–41). At the conclusion of his investigation, Hamilton advised Petitioner of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and informed him that Dollar had been eliminated as a suspect in the McWilliams case. *See Wilmington*, 983 N.E.2d at 1018. According to Hamilton, Petitioner appeared visibly shaken upon receiving this information and admitted that he had lied about Dollar's involvement in the killing. *Id.*

Petitioner remained at the police station for the next two days and provided additional names and other information about McWilliams's murder. *Id.* He went with detectives to look for two individuals he reported were involved in the crime, Ram and Stennis. *Id.* When Ram and Stennis couldn't be found, Petitioner took the officers to his home. *Id.* He informed the officers that McWilliams had been killed in the room he rented in the basement of his godmother's house, and he accompanied officers to search the basement upon executing a consent form. *Id.*; State Ct. Record (Dckt. No. 54-30, at 119–20). Petitioner explained to the

officers that the basement had been renovated since the murder – drywall had been installed, and additional furniture and a rug had been added to the room. *See Wilmington*, 983 N.E.2d at 1018.

On June 17, Petitioner gave a handwritten statement to Assistant State's Attorney George Canellis confessing to McWilliams's murder. *Id.* at 1018–19. The Illinois Supreme Court described Petitioner's statement this way:

> In the statement, [Petitioner] said that he met McWilliams at the Jeffery Pub's "gay night" in January 2003. He and McWilliams had oral and anal sex three or four times over the next year. [Petitioner] said no one knew he had "gay sex," including members of his gang, the Black Disciples, who did not like homosexuals. [Petitioner] stated, on March 3, 2004, McWilliams called him and asked for $200. [Petitioner] told McWilliams he did not have $200, but he encouraged McWilliams to come over anyway. When McWilliams arrived, no one else was at [Petitioner's] residence . . . . [H]e and the victim engaged in consensual sex acts . . . .
>
> After the sexual activity, McWilliams asked for $200 and told [Petitioner] he would be charging for sex. [Petitioner] and McWilliams argued, and McWilliams threatened to tell the police that [Petitioner] had raped him. McWilliams also told [Petitioner] that he had AIDS. [Petitioner] stated that McWilliams then produced a dark automatic gun, but [Petitioner] was able to get the gun away from McWilliams because [he] was bigger and stronger. The argument continued, [Petitioner] calling McWilliams a "little bitch." McWilliams threatened to tell people in the neighborhood that they were having sex. [Petitioner] . . . did not want people in the neighborhood to know he had sex with McWilliams. [Petitioner] stated, while he held the gun, McWilliams, whom [Petitioner] described as naked and unarmed, ran at him. [Petitioner] believed that he fired about four shots, striking McWilliams in the top of the head. [Petitioner] said McWilliams fell to the floor, bleeding, and he appeared to be dead.
>
> [Petitioner] stated he then put underwear and a shirt on McWilliams, hid the gun, and dragged McWilliams' body outside onto the sidewalk. [Petitioner] went to get help from a fellow gang member named Ramsey. [Petitioner] told Ramsey he killed McWilliams when a drug deal went bad. [Petitioner] stated that Ramsey came back to the house with him and told him to put the body in a garbage can. [Petitioner] got a garbage can nearby, picked up McWilliams' body, and threw it into the can. He and Ramsey then wheeled the can about a block away and left it there. [Petitioner] said he used bleach to clean the floor, and he threw out the shell casings and the rest of McWilliams' clothes. He gave the gun to another fellow gang member.

3

*Id.* at 1018–19.

Before memorializing Petitioner's statement, Canellis (again, the prosecutor) spoke to Petitioner outside the presence of the officers and asked him about his experience at the police station. (Dckt. No. 54-35, at 140–41). Petitioner said that he had been treated "pretty good." *Id.* at 141. He was given food and water, and he was giving his statement freely and voluntarily. *Id.* Canellis explained that the statement was not videorecorded because Petitioner did not want anyone to see him talking about his sexual orientation. *Id.* at 139–40.

Once Petitioner completed his statement, Canellis reviewed it with him and asked him to sign underneath the *Miranda* warnings. *See Wilmington*, 983 N.E.2d at 1019. Petitioner refused to sign the statement, instead opting to sign a photograph of himself taken at the time of the interview.[1] *Id.*

Petitioner was tried for McWilliam's murder and for concealing his body. The State introduced Petitioner's confession and presented evidence at trial corroborating his statement. *Id.* at 1019, 1024. The medical examiner explained that two bullets had entered McWilliams's head at a downward angle and traveled through his skull. *Id.* at 1024. The downward angle was consistent with Petitioner's description of the smaller McWilliams running at him "hunched over like he was going to attack." *See id.*; State Ct. Record (Dckt. No. 54-35, at 147–49).

---

[1] Petitioner filed a pre-trial motion to suppress his statement, arguing that he was not informed of his *Miranda* rights before police questioning, and that the length of his detention rendered his confession involuntary. (Dckt. No. 54-31, at 136). The trial court denied the motion following an evidentiary hearing. *Id.* at 146. In its ruling, the trial court found that (1) Petitioner had extensive experience with the criminal justice system and understood how to invoke his *Miranda* rights, but did not do so; (2) there was no evidence that the head injury Petitioner sustained from the aggravated battery (the subject of Petitioner's initial complaint to the police that brought him to the station) "contributed to either a pain situation or some other type of confusing situation" that led to his confession; (3) the length of time Petitioner spent at the police station was largely due to his own actions (*i.e.*, providing leads that were pursued but came to nothing); and (4) there was no evidence of any threats, promises, or duress by law enforcement. *Id.* at 141–46.

The medical examiner also noted that McWilliams suffered blunt trauma injuries, including bruising and large abrasions, that were consistent with his body having been dropped and dragged across the sidewalk after being shot. *See Wilmington*, 983 N.E.2d at 1019. However, the medical examiner could not confirm whether Petitioner and McWilliams had engaged in any sexual activity on the night of the murder. She did not see any apparent semen on the victim's body, and she did not take a rectal or oral swab as those were not typically part of an autopsy. *Id.*; State Ct. Record (Dckt. No. 54-34, at 136–37).

In addition, the garbage can where Petitioner hid McWilliams's body was assigned by the City of Chicago to a vacant building across the alley from Petitioner's home. *See Wilmington*, 983 N.E.2d at 1019, 1024; State Ct. Record (Dckt. No. 54-41, at 39–40). Consistent with Petitioner's confession, the garbage can was found a block away from his residence with McWilliams's body stuffed inside. *See Wilmington*, 983 N.E.2d at 1024. Police evidence technicians were unable to obtain fingerprints suitable for comparison from the garbage can. *Id.* at 1019. No evidence was obtained from Petitioner's room, which had been significantly altered since the murder. *Id.* at 1024.

One piece of evidence, however, was inconsistent with Petitioner's confession. McWilliams's body was found in more clothing than the T-shirt and underwear that Petitioner had described in his confession, including a T-shirt, boxer shorts, a shirt, a sweatshirt, jeans, socks, and a nylon cap (or "do-rag"). *Id.* at 1019.

In his defense, Petitioner presented evidence suggesting that he was physically incapable of committing the murder due to a seizure disorder. *Id.* at 1019. He called Dr. Hanlon who testified that Petitioner had mild mental retardation, a reading disorder, and a cognitive disorder related to a seizure disorder. *Id.*; State Ct. Record (Dckt. No. 54-36, at 29). Dr. Hanlon opined

that "due to [Petitioner's] long standing seizure disorder and his vulnerability to having seizures that may be precipitated by stress . . . it's unlikely that he would be able to perform or commit such a crime without having a seizure."   *See* State Ct. Record (Dckt. No. 54-36, at 37). However, Dr. Hanlon qualified his opinion, explaining it was "certainly possible" that Petitioner could have committed the murders despite this diagnosis, and he acknowledged that Petitioner's seizures were largely self-reported.   *Id.* at 37, 78, 84–85, 104.

The defense also called other witnesses from the Greater Grand Crossing neighborhood to call into question the reliability of Petitioner's confession.   *See* State Ct. Record (Dckt. No. 54-35, at 215–39; Dckt. No. 54-26, at 106–10).   Charles Bundy testified that he and McWilliams used to live in the same building and that McWilliams had been kicked out of the building shortly before his death.   *See* State Ct. Record (Dckt. No. 54-35, at 215–22).

Ronald Morgan, one of McWilliams's long-time friends who lived near the vacant building where the garbage can was assigned, testified that he held McWilliams's clothes for him in plastic bags after he was evicted.   *Id.* at 223–35.

Natalie Connie, another of McWilliams's friends, testified that she saw him in the neighborhood after midnight on the morning of his death.   *Id.* at 236–39.

Arnold Roberts, a homeless man who routinely collected items from the garbage cans in the neighborhood, testified that he did not see a body when he completed his rounds early that morning.   *See* State Ct. Record (Dckt. No. 54-36, at 106–10).

In rebuttal, the State called Alesia Hines, a paramedic who treated Petitioner following his arrest.   *See Wilmington*, 983 N.E.2d at 1019; State Ct. Record (Dckt. No. 54-37, at 41–42). According to Hines, Petitioner reported that his last seizure was in 1995.   *See* State Ct. Record (Dckt. No. 54-37, at 42).

Dr. Dawna Gutzmann, a staff psychiatrist at Forensic Clinical Services for the Circuit Court of Cook County, also testified about her evaluation of Petitioner. *Id.* at 52. Unlike his report to Dr. Hines, Petitioner told Dr. Gutzmann that his last seizure was in 2002. *See* State Ct. Record (Dckt. No. 54-37, at 59). Petitioner, however, provided a new history of his seizures each time he met with Dr. Gutzmann. *Id.* at 59, 72–73, 86–87. Based on his unreliable reporting, Dr. Gutzmann opined that Petitioner was malingering, which she described as "faking or exaggerating the symptoms of a psychological or a medical illness for secondary gain." *Id.* at 75–76. Dr. Gutzmann further opined that Petitioner did not have any mental or physical disorder that would have affected his ability to murder McWilliams. *Id.* at 84.

At the jury instruction conference, the State tendered a set of jury instructions that included the second-degree murder instruction as requested by Petitioner's counsel. *See* State Ct. Record (Dckt. No. 54-36, at 116–17). The trial court determined, based on "the status of the evidence," that a second-degree instruction was "appropriate" in Petitioner's case. *See* State Ct. Record (Dckt. No. 54-37, at 6). The trial court reviewed the tendered jury instructions in the presence of both attorneys and Petitioner. *Id.* at 6–13, 107–11.

In his closing argument, Petitioner's counsel questioned the reliability of Petitioner's confession to the police, pointing out the lack of other evidence linking Petitioner to the murder and the weaknesses in the State's case. *Id.* at 128–60. Defense counsel argued, however, that if the jury did believe Petitioner's confession, they should find Petitioner guilty of only second-degree murder:

> Now, you're going to hear about second-degree in a little bit. When you hear about second-degree, it's not because we're asking you to do that. It's because the facts indicate that if it's anything, that's what it is. The facts are, and it may sound like a stupid story. It [is] a stupid story. You shouldn't believe any of it. But if you are going to believe any of it, the facts are, according to the story, is that Guan brought the gun in Guan points the gun at [Petitioner] and he disarms

7

Guan. Guan knowing that he has the gun runs at him trying to get him. So if it's anything, it's second-degree.

*Id.* at 156–57.

Following deliberations, the jury found Petitioner guilty of first-degree murder and concealment of a homicidal death. *See Wilmington*, 983 N.E.2d at 1021. Petitioner was sentenced to consecutive prison terms of 50 years and 5 years. *Id.* at 1017, 1021.

### *Direct Appeal*

In his direct appeal, Petitioner argued that he was denied a fair trial because: (1) the trial court failed to obtain his consent to a jury instruction on second-degree murder; and (2) the trial court failed to comply with Illinois Supreme Court Rule 431(b).[2] *See* State Ct. Record (Dckt. No. 54-2, at 1–62).

The Illinois Appellate Court initially reversed Petitioner's convictions and sentences and remanded for a new trial, finding that the trial court's failure to comply with Illinois Supreme Court Rule 431(b) constituted plain error. *See People v. Wilmington*, 915 N.E.2d 882, 888–89 (Ill. App. Ct. 2009). The Illinois Supreme Court then issued a supervisory order directing the appellate court to vacate its judgment and reconsider in light of *People v. Thompson*, 939 N.E.2d 403 (Ill. 2010), which held that compliance with Rule 431(b) questioning is not indispensable to a fair trial or the selection of an impartial jury. *See People v. Wilmington*, 940 N.E.2d 1147 (Ill. 2011) (mem.).

On reconsideration, the Illinois Appellate Court affirmed Petitioner's convictions and sentences. The appellate court found that neither the trial court's flawed Rule 431(b)

---

[2] Illinois Supreme Court Rule 431(b) requires that Illinois trial courts examine all prospective jurors during *voir dire* and ask whether they understand and accept the following principles of law: (1) the defendant is presumed innocent; (2) the State must prove the defendant guilty beyond a reasonable doubt; (3) the defendant is not required to offer evidence on his or her own behalf; and (4) the defendant's failure to testify cannot be held against him or her. *See* Ill. Sup. Ct. R. 431(b).

examination, nor the failure to question Petitioner about the second-degree murder jury instruction, constituted plain error. *See People v. Wilmington*, 956 N.E.2d 466, 478 (Ill. App. Ct. 2011). The Illinois Supreme Court granted Petitioner's petition for leave to appeal, and affirmed. *See Wilmington*, 983 N.E.2d at 1027.

### *Post-Conviction Proceedings*

In his *pro se* petition for post-conviction relief, Petitioner raised a number of issues, including arguments about (1) the sufficiency of the evidence; (2) the voluntariness of his confession; (3) actual innocence; and (4) ineffective assistance of trial counsel. Petitioner faulted his trial counsel for failing to investigate an alibi defense, failing to object to the trial court's failure to comply with Illinois Supreme Court Rule 431(b), and failing to ensure that the trial court ascertained Petitioner's agreement to the second-degree murder jury instruction. *See* State Ct. Record (Dckt. No. 54-45, at 43–55).

In support of his petition, Petitioner attached an affidavit from Nathanial McCray, a fellow inmate at the Menard Correctional Center. McCray claimed that he was drinking and watching television with Petitioner at his grandmother's house on the night that McWilliams was murdered. *Id.* at 56. The trial court dismissed the post-conviction petition. *Id.* at 58–63.

On post-conviction appeal, Petitioner – with the assistance of a public defender – raised the issue of ineffective assistance of counsel. But the argument was more narrow than the argument in his *pro se* petition. Petitioner argued that trial counsel was ineffective for failing to investigate McCray as an alibi witness. *See* State Ct. Record (Dckt. 54-18, at 1–30).

The Illinois Appellate Court rejected Petitioner's argument and affirmed the dismissal of his post-conviction petition. *See People v. Wilmington*, 2015 WL 4936229, at *2–4 (Ill. App. Ct. 2015).

Petitioner, again represented by counsel, raised the same ineffective assistance of counsel claim in a petition for leave to appeal to the Illinois Supreme Court, which was denied. *See People v. Wilmington*, 48 N.E.3d 677 (Ill. 2016); State Ct. Record (Dckt. No. 54-24, at 1–21).

### Successive Post-Conviction Proceedings

Upon the conclusion of his state post-conviction proceedings, Petitioner filed this habeas corpus petition under 28 U.S.C. § 2254. *See* Petition for Writ of Habeas Corpus (Dckt. No. 1). Before the parties briefed the petition, Judge Shah (this Court's predecessor, before reassignment) granted Petitioner's motion to stay to allow Petitioner to pursue successive post-conviction relief in state court. *See* Petitioner's Mtn. to Stay (Dckt. No. 7); 5/20/16 Order (Dckt. No. 10).

Petitioner filed a successive post-conviction petition, arguing: (1) ineffective assistance of trial counsel for failing to investigate the circumstances surrounding his confession; (2) prosecutorial misconduct; and (3) insufficient evidence. *See* State Ct. Record (Dckt. No. 54-48, at 147–54).

To support his petition, Petitioner attached two letters from his sister. *Id.* at 155–59. In one of the letters, his sister claimed that Petitioner was framed for McWilliams's murder as a result of his seizure disorder and learning disability. *Id.* at 155, 157. The other letter referenced a civil rights lawsuit filed by an exoneree, Lafonso Rollins, in which Detective Hamilton was named as a defendant. *Id.* at 156, 159.

The state trial court denied Petitioner leave to file his successive post-conviction petition, and Petitioner appealed. *Id.* at 136–44, 182–83. On appeal, the Illinois Appellate Court granted Petitioner's appointed counsel's motion for leave to withdraw under *Pennsylvania v.*

*Finley*, 481 U.S. 551 (1987), and affirmed the judgment of the trial court. *See* State Ct. Record (Dckt. No. 54-26, at 2–16; Dckt. 54-27).

Petitioner sought leave to appeal to the Illinois Supreme Court, which denied his petition for leave to appeal. *See People v. Wilmington*, 132 N.E.3d 344 (Ill. 2019); State Ct. Record (Dckt. No. 54-28, at 1–10).

While Petitioner was pursing his successive post-conviction proceeding, this case was reassigned from Judge Shah to this Court. Upon completion of his successive post-conviction proceedings, this Court lifted the stay on Petitioner's habeas corpus proceeding and ordered briefing on the petition. *See* 6/26/20 Order (Dckt. No. 49); 7/13/20 Order (Dckt. No. 52). After Respondent filed an answer, the Court granted Petitioner's request for the appointment of counsel. *See* 11/9/20 Order (Dckt. No. 58). Petitioner's counsel then filed a reply brief in support of the habeas corpus petition.

## Discussion

Petitioner seeks habeas corpus on four grounds: (1) the trial court violated his due process right to a fair trial by admitting his confession; (2) the trial court failed to inquire whether Petitioner consented to a jury instruction on second-degree murder; (3) the trial court failed to comply with Illinois Supreme Court Rule 431(b), and thus violated his due process right to a fair trial; and (4) Petitioner's trial counsel provided ineffective assistance by failing to investigate an alibi witness, Nathaniel McCray. *See* State Ct. Record (Dckt. No. 1, at 12–16).

Petitioner has not demonstrated a basis for federal habeas relief. Claim I is procedurally defaulted. Claim II does not establish that the state court's decision was contrary to clearly established federal law. Claim III is procedurally defaulted, and raises a non-cognizable

11

question of state law.   Finally, Claim IV (like Claim II) does not establish that the state court's decision was contrary to clearly established federal law.

For the sake of simplicity, the Court will group the issues.   The Court will begin with the procedural default (Claims I and III).   Next, the Court will address the non-cognizable question of state law (Claim III).   Finally, the Court will take up the lack of a violation of clearly established federal law (Claims II and IV).

## I.    Procedural Default (Claims I and III)

The Court begins with the procedural default.   The punchline is that Petitioner is advancing arguments that he did not exhaust in state court, so he cannot raise them here.

"A federal habeas court generally may consider a state prisoner's federal claim only if he has first presented that claim to the state court in accordance with state procedures."   *Shinn v. Ramirez*, 142 S. Ct. 1718, 1727 (2022).   If he fails to do so, the claim is procedurally defaulted. *Id.*

A claim under 28 U.S.C. § 2254 can be procedurally defaulted in one of two ways.   The first type of procedural default occurs when a prisoner fails to fully exhaust the state court remedies for his federal claim, and he no longer can do so under the state's procedural laws. *See Thomas v. Williams*, 822 F.3d 378, 384 (7th Cir. 2016); 28 U.S.C. § 2254(b)(1)(A).   In other words, a state prisoner must "'fairly present[]'" his federal claims to the state courts "so that the state has a 'fair opportunity to consider' the issues 'and to correct that asserted constitutional defect'" before he can seek federal habeas corpus relief.   *Reynolds v. Hepp*, 902 F.3d 699, 705 (7th Cir. 2018) (quoting *Picard v. Connor*, 404 U.S. 270, 275-76 (1971)).

To satisfy this requirement, a state prisoner must "invok[e] one complete round of the State's established appellate review process," which in Illinois includes presenting the argument

12

in a petition for leave to appeal to the Illinois Supreme Court. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). Failure to do so leads to procedural default. *See Wilson v. Cromwell*, 58 F.4th 309, 319 (7th Cir. 2023) (holding that "a petitioner must assert that claim throughout at least one complete round of state-court review, whether on direct appeal of his conviction or in postconviction proceedings") (quotation marks omitted).

The second type of procedural default "comes from the independent and adequate state ground doctrine." *Thomas*, 822 F.3d at 384 (citing *Coleman v. Thompson*, 501 U.S. 722, 729– 30 (1991)). "Federal habeas courts reviewing convictions from state courts will not consider claims that a state court refused to hear based on an adequate and independent state procedural ground." *Davila v. Davis*, 137 S. Ct. 2058, 2062 (2017). Federal courts will not review the merits of a habeas corpus claim "if the relevant state court's disposition of the claim rests on a state law ground that is adequate and independent of the merits of the federal claim." *Triplett v. McDermott*, 996 F.3d 825, 829 (7th Cir. 2021). "The ground is adequate if it is 'firmly established and regularly followed as of the time when the procedural default occurred.'" *Id.* (quoting *Richardson v. Lemke*, 745 F.3d 258, 271 (7th Cir. 2014)). And "[i]t is independent of federal law if it does not depend on the merits of petitioner's claim." *Id.*

Putting them together, one type of procedural default involves stopping too soon, and not going far enough in the state court system. The other type of procedural default involves reaching a dead end and hitting a wall under state law. Both theories of procedural default advance "comity, finality, and federalism interests." *Davila*, 137 S. Ct. at 2064.

This Court may excuse a procedural default only if Petitioner "demonstrates either (1) 'cause for the default and actual prejudice,' or (2) 'that failure to consider the claims will

13

result in a fundamental miscarriage of justice.'" *Thomas*, 822 F.3d at 386 (quoting *Coleman*, 501 U.S. at 750).

"To establish 'cause' . . . the prisoner must 'show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Davila*, 137 S. Ct. at 2065 (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). "To demonstrate a fundamental miscarriage of justice, a petitioner must show that 'a constitutional violation has probably resulted in the conviction of one who is actually innocent' such that 'it is more likely than not that no reasonable juror would have convicted [the petitioner] in the light of the new evidence.'" *Id.* (alteration in original) (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

With that backdrop in mind, the Court will consider whether there is a procedural default of two claims: the claim about the coerced confession (Claim I), and the claim about a failure to comply with Illinois Supreme Court Rule 431(b) (Claim III). The Court concludes that each claim is procedurally defaulted.

### A.      Coerced Confession (Claim I)

Petitioner argues that the trial court violated his due process right to a fair trial by admitting his confession into evidence. *See* Petition for Writ of Habeas Corpus, at 12 (Dckt. No. 1). He contends that his statement was involuntary and coerced by Detective Hamilton, who allegedly used physically abusive tactics. *Id.*

Petitioner did not raise a coerced confession claim on direct appeal. He raised it only in his initial *pro se* post-conviction petition. *See* State Ct. Record (Dckt. No. 54-45, at 43–55). He abandoned the claim in his post-conviction appeal, and in his post-conviction petition for leave to appeal. *See* State Ct. Docket (Dckt. No. 54-18, at 130; Dckt. No. 54-24, at 1–21). The claim was not raised by Petitioner in successive post-conviction proceedings, either.

14

Viewing that record as a whole, Petitioner dropped the argument (on direct appeal), before raising it for the first time (in his first post-conviction petition), before dropping it three more times (in his post-conviction appeal, in his post-conviction petition for leave to appeal, and in his successive post-conviction proceedings). Accordingly, the claim is procedurally defaulted. *See Boerckel*, 526 U.S. at 845.

Petitioner does not dispute his failure to exhaust his coerced confession claim in post-conviction proceedings. *See* Petitioner's Reply Br., at 15 (Dckt. No. 64). Instead, he argues that the claim was exhausted in his successive post-conviction proceedings because he argued that trial counsel was ineffective for failing to investigate the circumstances surrounding his confession. *Id.*; *see also* State Ct. Record (Dckt. No. 54-28, at 2, 8–10; Dckt. No. 54-48, at 150). Relying on *Malone v. Walls*, 538 F.3d 744 (7th Cir. 2008), Petitioner argues that because allegations of physical coercion were embedded within his ineffective assistance of trial counsel claim, the coerced confession issue was fairly presented at each level of state court review. *See* Petitioner's Reply Br., at 14–16 (Dckt. No. 64).

Generally, "an assertion that one's counsel was ineffective for failing to pursue particular constitutional issues is a claim separate and independent of those issues." *Lewis v. Sternes*, 390 F.3d 1019, 1026 (7th Cir. 2004); *see also McGhee v. Watson*, 900 F.3d 849, 853 (7th Cir. 2018); *Howard v. O'Sullivan*, 185 F.3d 721, 725 (7th Cir. 1999) (a constitutional claim presented to the state courts only as part of an ineffective assistance of counsel claim does not satisfy § 2254(b)'s exhaustion requirement for the underlying constitutional claim).

*Malone* provides a narrow exception to this rule. In *Malone*, the Seventh Circuit held that a habeas petitioner may "raise[] ineffective assistance of appellate counsel as a means for the court to reach the ineffective assistance of trial counsel, i.e., as the cause for failing to raise the

ineffective assistance of trial counsel claim." 538 F.3d at 755. There, the petitioner made "clear that he [was] asking the court to redress the failure of his trial counsel, an issue the court can reach if it determines that his appellate counsel also was ineffective." *Id.*

So, under *Malone*, a petitioner does not procedurally default his claim that trial counsel was ineffective by not raising that claim on appeal if his appellate counsel was also ineffective (in not raising the ineffectiveness claim). In these cases, a petitioner may point to his ineffective appellate counsel as the reason to excuse his failure to raise the ineffectiveness claim on appeal.

"[F]ederal habeas review is not precluded in circumstances where it is clear that the petitioner raises an ineffective assistance of appellate counsel claim as a means for the court to excuse procedural default and reach a claim for ineffective assistance of trial counsel." *Scott v. Butler*, 2016 WL 8671908, at *6 (N.D. Ill. 2016) (citing *Malone*, 538 F.3d at 755). The exception is based on cascading errors by counsel at two levels of state court review.

Here, Petitioner's ineffective assistance of trial counsel claim that he presented to the state court does not implicate the *Malone* exception. His ineffective assistance argument was based on the information that he received from his sister about the *Rollins* case, which, in his view, shows Detective Hamilton's "pattern and practice of abuse." *See* State Ct. Record (Dckt. No. 54-48, at 150–151, 153, 156, 159).

In other words, Petitioner argued to the state court that his attorney should have conducted further investigation into Hamilton's history to advance a physical coercion argument. *See id.* at 153. He did not challenge the effectiveness of his *appellate* counsel to bring an ineffective assistance of *trial* counsel claim.

So, *Malone*'s exception doesn't apply. That means trial counsel's allegedly defective performance for failing to investigate Detective Hamilton is a different claim than a coerced

confession claim. *See Lewis*, 390 F.3d at 1026 (7th Cir. 2004); *Scott*, 2016 WL 8671908, at *7 (rejecting *Malone* argument and holding that a prosecutorial misconduct claim was procedurally defaulted when not raised as an independent claim through one complete round of state court review); *Mata v. Brannon*, 2020 WL 5630433, at *5 (N.D. Ill. 2020) (holding that a voluntary statement claim was procedurally defaulted when petitioner failed to present the issue as a separate claim, independent of his ineffective assistance of counsel claims).

Petitioner was required to fairly present his coerced confession claim through one complete round of state court review. He did not. Claim I is therefore procedurally defaulted.

Petitioner responds by arguing that any procedural default should be excused under the exception for a fundamental miscarriage of justice. *See* Petitioner's Reply Br., at 16–18 (Dckt. No. 64).[3] Petitioner argues that he is actually innocent because his confession was physically coerced and, without his confession, "little would be left to convict" him. *Id.* at 18. He contends that his personal allegations of physical coercion – combined with Detective Hamilton's involvement in the Lafonso Rollins lawsuit[4] and the general history of police misconduct within the Chicago Police Department[5] – establish his actual innocence. *Id.* at 17.

The fundamental miscarriage of justice exception is reserved for only the truly exceptional case where "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup*, 513 U.S. at 327 (quotation marks omitted). To excuse his default on these grounds, Petitioner must demonstrate that it is "'more likely than not, in light of

---

[3] Petitioner does not argue that he can establish cause and prejudice to excuse any procedural default. *See* Petitioner's Reply Br., at 16–18 (Dckt. No. 64). So, the Court does not address the cause and prejudice exception. *See Wilson v. Cromwell*, 58 F.4th 309, at 319 & n.8 (7th Cir. 2023) (declining to address the cause and prejudice when the petitioner did not allege that the exception applied).

[4] *See Rollins v. Hamilton*, No. 1:05-cv-2532 (N.D. Ill.).

[5] In support of his generalized police misconduct claim, Petitioner cites to a 2014 law review article. *See* Petitioner's Reply Br., at 17 n.1 (Dckt. No. 64) (citing G. Flint Taylor, *Chicago Police Torture Scandal: A Legal and Political History*, CUNY L. Rev. 329 (2014)).

the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt – or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt.'" *Blackmon v. Williams*, 823 F.3d 1088, 1101 (7th Cir. 2016) (quoting *House v. Bell*, 547 U.S. 518, 538 (2006)). This is a "demanding and seldom met" standard. *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013) (quotation marks omitted); *see also Wilson*, 58 F.4th at 321 (noting "that the *Schlup* standard is demanding and permits review only in the extraordinary case") (quotation marks omitted).

Petitioner's actual innocence claim "must be both credible and founded on new evidence." *Arnold v. Dittmann*, 901 F.3d 830, 836 (7th Cir. 2018). The claim requires "'new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence.'" *Gladney v. Pollard*, 799 F.3d 889, 896 (7th Cir. 2015) (quoting *Schlup*, 513 U.S. at 324). Evidence is "new in the sense that it was not before the trier of fact." *Arnold*, 901 F.3d at 836–37. Any "new evidence must be considered along with the existing evidentiary record." *Wilson*, 58 F.4th at 321.

The only evidence specific to his case that Wilmington provides is his own affidavit stating that prosecutor "Canellis watched the police detective beat [him] down in the 111th street police station for refusing to sign a false and illegal statement on a homicide that [he] knew nothing about." *See* Wilmington Affidavit (Dckt. No. 1, at 8 of 17). Wilmington's affidavit does not mention Detective Hamilton, or any other detective, by name. *Id.*

Petitioner relies heavily on this affidavit – and his other allegations – about Detective Hamilton, but the record refutes his claims. Petitioner testified at the hearing on his pre-trial motion to suppress his confession, but he made no mention of experiencing physical abuse or

other coercive tactics.   *See* State Ct. Record (Dckt. No. 54-30, at 105–61).   If Petitioner had

suffered abuse, one would think that Petitioner would have said so at the time.

In fact, he did the opposite.   He indicated to Canellis that he had been treated "pretty

good" by the detectives.   *See* State Ct. Record (Dckt. No. 54-35, at 140–41, 153).   He

confirmed that he was giving his statement freely and voluntarily, and that he wanted to "clear

his conscience."   *Id.*

Petitioner raised his claim of abuse during his confession for the first time nine years

after his trial and twelve years after his confession.   *See* Wilmington Affidavit (Dckt. No. 1, at 8

of 17).   That substantial delay limits the statement's reliability.   *See McQuiggin*, 569 U.S. at

399 ("Unexplained delay in presenting new evidence bears on the determination whether the

petitioner has made the requisite showing."); *Blackmon*, 823 F.3d at 1102 ("Furthermore, they

did not come forward until eight years after the murder, a substantial delay that could affect their

memories and/or their credibility."); *McDowell v. Lemke*, 737 F.3d 476, 484 (7th Cir. 2013)

("Such 'eleventh hour' affidavits containing facts not alleged at trial and accompanied by no

reasonable explanation for delay are inherently suspect.").

Additionally, whether Petitioner was abused during his confession is evidence that would

have been known to him during his trial.   There is nothing to indicate that some revelation has

made this information available only now.

In sum, Wilmington's affidavit does not establish that he is actually innocent of

murdering McWilliams.   *See Buie v. McAdory*, 341 F.3d 623, 626 (7th Cir. 2003) ("A defendant

who asserts actual innocence as a reason to excuse a procedural default must *demonstrate*

innocence.") (emphasis in original).   The affidavit is not the type of "powerful evidence" that

demonstrates Petitioner's innocence "so convincingly that no reasonable jury could convict."

*Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005) ("To demonstrate innocence so convincingly that no reasonable jury could convict, a prisoner must have documentary, biological (DNA), or other powerful evidence:   perhaps some non-relative who placed him out of the city, with credit card slips, photographs, and phone logs to back up the claim.").   It is a late-in-the-day, long-in-the-tooth statement that does not diminish the weighty evidence on the other side of the scale.

Nor does the circumstantial evidence about Detective Hamilton's conduct in *other* cases and about police misconduct generally establish Petitioner's actual innocence.

Petitioner provides no additional evidence corroborating his allegations about Hamilton, other than the *Rollins* lawsuit.   He argues that this lawsuit, and the general allegations of police misconduct in the Chicago Police Department, demonstrate the reliability of his allegations.

The Seventh Circuit has rejected similar arguments based on unrelated evidence of police misconduct.   Highly generalized allegations about misconduct in other cases does not advance the ball very far down the habeas field:

> The voluminous evidence of Detective Guevara's misfeasance in other cases similarly fails to establish that McDowell was actually innocent. Even if we believed all of the allegations, they remain collateral to McDowell's case.   While they may be able to establish that Detective Guevara intentionally induced erroneous identifications in other cases, they cannot definitively prove he did so in McDowell's case.   Rather than establishing McDowell's innocence, they tend to impeach Guevara's credibility.   And latter-day impeachment evidence "seldom, if ever, make[s] a clear and convincing showing that no reasonable juror would have believed the heart of [the witness's] account . . . ."

*McDowell*, 737 F.3d at 484 (alterations in original); *see also Booker v. Hardy*, 2021 WL 1923378, at *10 (N.D. Ill. 2021) ("Alleged misconduct by police officials in other cases does not, by itself, demonstrate the prisoner is innocent in his case.").

Here, too, Petitioner's claims about the *Rollins* lawsuit and the Chicago Police Department do not "definitively prove" misconduct occurred in his case, nor do they establish that he is actually innocent of murdering McWilliams.   *See McDowell*, 737 F.3d at 484.

Regardless, more than ample evidence at Petitioner's trial corroborated his confession. For example, consider the location of the wounds.   McWilliams sustained two gunshot wounds to the top of his head.   The trajectory of the bullets was consistent with Petitioner's description of shooting the smaller McWilliams in the head multiple times as McWilliams charged at him hunched over.

The injuries to McWilliams's body are consistent with the confession, too.   The body was scratched and bruised.   The damage was consistent with being dropped and dragged across the sidewalk to the garbage can, where Petitioner confessed to disposing the body.

The origin and location of the garbage can is consistent with the confession, too.   The garbage can was assigned to a vacant building that shared an alley with Petitioner's residence. It ended up a block away, as Petitioner described.

True, Petitioner's room lacked physical evidence of the murder, but once again, Petitioner's confession lines up.   Petitioner confessed to bleaching and cleaning the crime scene after killing McWilliams, and to renovating the room after the murder.   *See Wilmington*, 983 N.E.2d at 1018–19; *see also* State Ct. Record (Dckt. No. 54-35, at 100–01).

The only inconsistency between Petitioner's confession and the evidence was the amount of clothing McWilliams was wearing when his body was found.   This lone inconsistency, however, does not overcome the significant evidence corroborating the specific details of McWilliams's death.

Petitioner does not mention McCray's affidavit when making his actual innocence argument. But even if Petitioner had done so, that affidavit falls far short of establishing what is necessary under the stringent *Schlup* standard. McCray's statement about Petitioner's alibi was made more than eight years after the murder. As with Wilmington's affidavit, that delay limits the statement's reliability. *See McQuiggin*, 569 U.S. at 399; *Blackmon*, 823 F.3d at 1102; *McDowell*, 737 F.3d at 484.

Beyond the delay, a reasonable jury could plausibly reject McCray's statement. There were loads of other signs pointing to Petitioner's guilt. He voluntarily inserted himself into the murder investigation. He attempted to implicate other individuals in the murder that were quickly cleared. He never mentioned McCray despite providing other names and information to the police. He had a motive to kill given his gang affiliation and the victim's threat of exposing his sexual orientation. And above all else, he provided a statement confessing to the murder.

In other words, as with Wilmington's affidavit, McCray's affidavit is not the type of "powerful evidence" that demonstrates Petitioner's innocence "so convincingly that no reasonable jury could convict." *Hayes*, 403 F.3d at 938.

In sum, Petitioner cannot establish actual innocence to excuse the procedural default of Claim I. Claim I is denied.

## B. Failure to Comply with Rule 431(b) (Claim III)

Petitioner alleges a due process violation based on the trial court's failure to fully comply with the *voir dire* examination requirements in Illinois Supreme Court Rule 431(b). *See* Petition for Writ of Habeas Corpus, at 14 (Dckt. No. 1). Specifically, Petitioner contends that the trial court failed to properly examine jurors on their understanding and acceptance of Petitioner's absolute right not to testify. *Id.*

22

Petitioner's Rule 431(b) claim was last substantively reviewed by the Illinois Supreme Court on his direct appeal. *See Wilmington*, 983 N.E.2d at 1021–25. Because Petitioner failed to preserve the challenge for appeal, the Illinois Supreme Court limited its review of the issue to "plain error." *Id.* at 1022. The Illinois Supreme Court denied Petitioner's claim, holding that the trial court's error in conducting its Rule 431(b) examination did not constitute a plain error requiring reversal. *Id.* at 1022–25.

To preserve a claim for appeal under Illinois law, a petitioner must object to the error at trial and include the error in a post-trial motion. Failure to do so leads to forfeiture of the claim. *See People v. Herron*, 830 N.E.2d 467, 472–73 (Ill. 2005); *see also People v. Johnson*, 939 N.E.2d 475, 479 (Ill. 2010). An Illinois appellate court's refusal to review the merits of a claim because it was not properly preserved under Illinois's forfeiture rule constitutes an adequate and independent state ground for procedural default. *See Kaczmarek v. Rednour*, 627 F.3d 586, 592 (7th Cir. 2010); *Miranda v. Leibach*, 394 F.3d 984, 992–93 (7th Cir. 2005); *see also Rosario v. Akpore*, 967 F. Supp. 2d 1238, 1250 (N.D. Ill. 2013).

The state court's limited review of a forfeited claim for plain error does not cure the procedural default, as "that limited review does not constitute a decision on the merits." *Kaczmarek*, 627 F.3d at 592 (citing *Gray v. Hardy*, 598 F.3d 324, 329 (7th Cir. 2010) (collecting cases)); *Miranda*, 394 F.3d at 992; *Rosario*, 967 F. Supp. 2d at 1250–51. Because the Illinois Supreme Court found the claim forfeited, and reviewed the issue only for plain error, Petitioner's Rule 431(b) claim is procedurally defaulted.

Petitioner cannot excuse the default of this claim. Although Petitioner argued in his *pro se* post-conviction petition that his trial counsel was ineffective in failing to object to the trial court's Illinois Supreme Court Rule 431(b) examination, his counseled post-conviction appeal

23

and post-conviction petition for leave to appeal did not raise this claim. *See* State Ct. Record (Dckt. No. 54-45, at 48–50). That means the claim is procedurally defaulted. *See Edwards*, 529 U.S. at 453 (holding that an ineffective assistance argument to excuse a default must be exhausted through one complete round of state court review).

Moreover, ineffective assistance of post-conviction counsel is not a ground for excusing a procedural default. *See Davila*, 137 S. Ct. at 2062–63.

The fundamental miscarriage of justice exception does not excuse Petitioner's default, either. As explained above, Petitioner confessed to murdering McWilliams and the details in his confession were confirmed by the physical evidence. Claim III is denied.

## II.     Non-Cognizable Question of State Law (Claim III)

But even setting aside procedural default, Claim III fails for a second, independent reason. Petitioner is challenging the trial court's compliance with Illinois Supreme Court Rule 431(b). He raises a non-cognizable issue of state law.

Petitioner concedes his claim is about an error of state law. But Petitioner contends the trial court's failure to question the jury regarding his decision not to testify was grave enough to amount to a deprivation of due process. *See* Petitioner's Reply Br., at 22–23 (Dckt. No. 64).

"The habeas statute 'unambiguously provides that a federal court may issue a writ of habeas corpus to a state prisoner only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.'" *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (quoting *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) (per curiam)). As the Supreme Court has "stated many times[,] . . . 'federal habeas corpus relief does not lie for errors of state law.'" *Id.* (quoting *Estelle v. McGuire*, 502 U.S. 62, 67 (1991)). Because "[t]he remedial power of a federal habeas court is limited to violations of the petitioner's federal rights," this Court can

24

intervene only "if a state court's errors have deprived the petitioner of a right under federal law." *Perruquet v. Briley*, 390 F.3d 505, 511 (7th Cir. 2004). "To say that a petitioner's claim is not cognizable on habeas review is thus another way of saying that his claim 'presents no federal issue at all.'" *Id.* (quoting *Bates v. McCaughtry*, 934 F.2d 99, 101 (7th Cir. 1991)).

The purpose of Illinois Supreme Court Rule 431(b), as explained by the Illinois Supreme Court, is to "promote the selection of an impartial jury." *Thompson*, 939 N.E.2d at 414. But as the state supreme court clarified, "compliance with the rule is not indispensable to a fair trial." *Id.*

> Rule 431(b) questioning is only one method of helping to ensure the selection of an impartial jury. It is not the only means of achieving that objective. A violation of Rule 431(b) does not implicate a fundamental right or constitutional protection, but only involves a violation of this court's rules. . . . [W]e cannot conclude that Rule 431(b) questioning is indispensable to the selection of an impartial jury.

*Id.* (citation omitted); *see also People v. Glasper*, 917 N.E.2d 401, 415 (Ill. 2009) ("Defendants do not have a right to Rule 431(b)(4) questioning under either the United States or the Illinois Constitution. A defendant's 'right' to such questioning . . . is the product of this court's inherent power to make rules regulating the conduct of the circuit courts.").

Because the state court's *voir dire* rule does not implicate a federal constitutional right, judges in this district have consistently rejected habeas corpus claims based on violations of Illinois Supreme Court Rule 431(b). *See Spears v. Lawrence*, 2019 WL 3555152, at *8 (N.D. Ill. 2019) (holding that a Rule 431(b) claim "does not set forth any violation of clearly established federal law"); *Johnson v. Williams*, 2015 WL 2452828, at *6 (N.D. Ill. 2015) ("Because compliance with Illinois Supreme Court Rule 431(b) is not required by the United States Constitution, this [claim] is not a cognizable ground for habeas relief."); *United States ex rel. Murithi v. Butler*, 2015 WL 1399511, at *12 (N.D. Ill. 2015) ("Federal law does not require

that prospective jurors be affirmatively asked if they agree with [Rule 431(b)] principles . . . .");
*Rosario*, 967 F. Supp. 2d at 1250 (holding that a due process claim based on an alleged violation
of Rule 431(b) was "not cognizable on habeas review").

Accordingly, Petitioner's claim based on Illinois Supreme Court Rule 431(b) must fail as
it "presents no federal issue at all."   *Perruquet*, 390 F.3d at 511 (quotations marks omitted).
Rather, his claim rests solely on an issue of state law.   Thus, even if claim III were not
procedurally defaulted, Petitioner would not be able to obtain section 2254 relief as his claim is
non-cognizable.   Claim III is denied.

### III.   Clearly Established Federal Law (Claims II and IV)

Two of Petitioner's claims stumble over a third hurdle.   Claims II and IV fail to raise a
violation of clearly established federal law.

For claims that the state court adjudicated on the merits, this Court's review is governed
by 28 U.S.C. § 2254(d).   Under that provision, federal habeas relief is unavailable for claims
"unless the adjudication of the claim . . . (1) resulted in a decision that was contrary to, or
involved an unreasonable application of, clearly established Federal law, as determined by the
Supreme Court of the United States; or (2) resulted in a decision that was based on an
unreasonable determination of the facts in light of the evidence presented in the State court
proceeding."   *See* 28 U.S.C. § 2254(d).

As the Supreme Court "has stated unequivocally, and on more than one occasion, . . .
'clearly established law as determined by [the Supreme] Court refers to the holdings, as opposed
to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court
decision.'"   *Berkman v. Vanihel*, 33 F.4th 937, 945 (7th Cir. 2022) (quoting *Yarborough v.
Alvarado*, 541 U.S. 652, 660-61 (2004)).   Critically, "[i]t does not include reasonable extensions

26

of those holdings in circuit precedent." *Id.* Nor does it include "innovative constitutional interpretation[s]." *Baird v. Davis*, 388 F.3d 1110, 1115 (7th Cir. 2004).

"A state-court decision will . . . be contrary to . . . clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases . . . [or] confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different . . . ." *Williams*, 529 U.S. at 405–06.

For a state court decision to be an unreasonable application of clearly established federal law, it must be "objectively unreasonable." *Felton v. Bartow*, 926 F.3d 451, 464 (7th Cir. 2019) (quotation marks omitted). This standard is demanding. It is a heavy lift.

"Unreasonable in this context means something lying well outside the boundaries of permissible differences of opinion." *McGhee v. Dittmann*, 794 F.3d 761, 769 (7th Cir. 2015) (cleaned up). The decision must be "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

## A. Second-Degree Murder Jury Instruction (Claim II)

Petitioner argues that he was denied the right to a fair trial when the trial court judge failed to tell him that it was his right, not counsel's, to decide whether to request a jury instruction for second-degree murder.[6] *See* Petition for Writ of Habeas Corpus, at 13 (Dckt. No.

---

[6] Under Illinois law, a defendant is guilty of second-degree murder when he or she commits first-degree murder and "[a]t the time of the killing he or she believes the circumstances to be such that, if they existed, would justify or exonerate the killing" but "his [or her] belief is unreasonable." 720 ILCS 5/9-2(a)(2); *see also* State Ct. Record (Dckt. No. 54-43, at 92) (jury instruction on second-degree murder given at Petitioner's trial).

1).   Petitioner contends that the decision to offer this instruction belonged to him alone, and that counsel's failure to consult Petitioner on the instruction violated his right to due process.   *Id.*

The last state court to address Petitioner's jury instruction claim on the merits was the Illinois Supreme Court on direct appeal.   *See Wilmington*, 983 N.E.2d at 1025–27.   So, the Court reviews the reasoning in that opinion.   *See Stitts v. Wilson*, 713 F.3d 887, 891 (7th Cir. 2013) ("When a state collateral review system issues multiple decisions, we typically consider the last reasoned opinion on the claim . . . [u]nless [that] state-court opinion adopts or incorporates the reasoning of a prior opinion . . . .") (alternations in original) (quotation marks omitted).

Under Illinois law, when a lesser-included offense instruction is given, the trial court is required to conduct an inquiry in the defendant's presence to determine whether the defendant has been advised of the potential risks associated with the instruction and to confirm the defendant's agreement to giving the instruction.   *See People v. Medina*, 851 N.E.2d 1220, 1228 (Ill. 2006); *see also People v. Brocksmith*, 642 N.E.2d 1230, 1233 (Ill. 1994) (holding that the decision to give a lesser-included offense instruction belongs to the defendant, not defense counsel).   Petitioner relied on these principles in his direct appeal and argued that this principle applied to an instruction on second-degree murder.   *See* State Ct. Record (Dckt. No. 54-13, at 13–16) (Petitioner's petition for leave to appeal in his direct appeal).

The Supreme Court of Illinois disagreed:

> Second degree murder is not a lesser-included offense of first degree murder; rather, it is more accurately described as a *lesser-mitigated* offense of first degree murder.   While a defendant who tenders a lesser-included offense instruction exposes himself to potential criminal liability, which he otherwise might avoid if neither the trial judge nor the prosecutor seeks the pertinent instruction, that is not the case with the tender of a second degree murder instruction, as a defendant can only be found guilty of second degree murder if the State has first proven all the

28

> elements of first degree murder.   Clearly, he is not exposing himself to potential criminal liability which he might otherwise avoid.   Thus, the rationale underpinning the decisions in *Brocksmith* and *Medina* does not apply here.

*Wilmington*, 983 N.E.2d at 1026 (cleaned up) (emphasis in original).

The Illinois Supreme Court concluded that the trial court "did *not* err when it failed to inquire whether [Petitioner] consented to the tender of a second-degree murder instruction," as "it was *defense counsel's* decision to pursue a strategy of questioning the reliability of the confession, but offering the jurors the option of second degree murder if that strategy failed and they found that [Petitioner] *did* in fact confess to the murder."   *Id.* at 1027 (emphases in original).   The Illinois Supreme Court therefore rejected Petitioner's jury instruction claim.   *Id.*

Petitioner contends that the Illinois Supreme Court's decision was contrary to Supreme Court precedent establishing a defendant's "[a]utonomy to decide that the objective of the defense is to assert innocence."   *See* Petitioner's Reply Br., at 19–20 (Dckt. No. 64).   He relies on *McCoy v. Louisiana*, 138 S. Ct. 1500, 1508 (2018), decided after his direct appeal, which held that the decision to admit guilt belongs to the defendant, not defense counsel.

Petitioner says that the "overarching objective" of his defense was to argue that he did not commit the crime.   *See* Petitioner's Reply Br., at 22 (Dckt. No. 64).   He therefore believes that the decision whether to give the jury an instruction on second-degree murder belonged to him, as the instruction required him "to admit guilt to the first degree murder charge and open him up to liability for a crime which he was otherwise not charged with."   *Id.*

Petitioner's argument is unavailing.   No Supreme Court precedent clearly establishes that criminal defendants have the exclusive right to decide whether the jury is instructed on a lesser-mitigated offense.   *McCoy* concerned only the decision to admit guilt, not the decision to ask for instructions on lesser-mitigated offenses.   So, *McCoy* is inapplicable here.

Moreover, the Seventh Circuit has held that the decision whether to request Illinois's second-degree murder instruction is one of strategy reserved for trial counsel. *See Mitchell v. Enloe*, 817 F.3d 532, 538 (7th Cir. 2016) ("Our case law establishes that where evidence at trial supports a lesser jury instruction, trial counsel may make a strategic decision not to request such instruction."). A defendant does not have a clearly established constitutional right to decide whether to give the jury the second-degree murder instruction.

Here, counsel presented the jury with a secondary defense that allowed it to consider mitigating factors should they believe Petitioner's confession. The second-degree murder instruction was given in support of this alternative argument. Whether this tactic was a reasonable strategy raises an issue of effective assistance of counsel, but Petitioner does not advance that argument here. Instead, he argues only that the jury instruction decision should have fallen to him.

This right, however, has not been clearly established by the Supreme Court, and this Court cannot entertain the "innovative interpretation" of *McCoy* that Petitioner advances in support of his claim. *See Baird*, 388 F.3d at 1115 ("Ordinarily of course a litigant can ask a lower federal court for an innovative constitutional interpretation . . . [b]ut that path is closed when the case before the court is an application for habeas corpus relief.").

Regardless, even if Petitioner's claim squarely raised the issue decided in *McCoy*, that rule is not available to him on habeas review. *McCoy* announced a new rule of criminal procedure and was decided *after* Petitioner's direct appeal. New rules of criminal procedure do not apply retroactively on habeas review. *See Edwards v. Vannoy*, 141 S. Ct. 1547, 1562 (2021); *see also Christian v. Thomas*, 982 F.3d 1215, 1225 (9th Cir. 2020) (holding that *McCoy*

is not retroactive on habeas review).   So, even if Petitioner raised a *McCoy* claim, he cannot rely on it now.

Because there is no Supreme Court precedent clearly establishing Petitioner's right to decide whether a jury instruction on a lesser-mitigating offense be given at trial, habeas relief is unavailable.   *See Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (per curiam); *Carey v. Musladin*, 549 U.S. 70, 76 (2006).   Accordingly, Claim II is denied.

### B.   Ineffective Assistance of Trial Counsel (Claim IV)

Petitioner argues that his trial counsel was ineffective in failing to investigate and call an alibi witness, Nathanial McCray, to testify at trial.   *See* Petition for Writ of Habeas Corpus, at 15–16 (Dckt. No. 1).   He contends that counsel's failure to investigate McCray was not a strategic decision and therefore violated his Sixth Amendment right to effective assistance of counsel.   *See* Petitioner's Reply Br., at 23–24 (Dckt. No. 64).   This Court looks to the state appellate court's decision on post-conviction appeal as it was the "last reasoned state-court decision" addressing the merits of Petitioner's ineffective assistance claim.   *Dassey v. Dittmann*, 877 F.3d 297, 302 (7th Cir. 2017) (en banc) (quoting *Johnson v. Williams*, 568 U.S. 289, 297 n.1 (2013)).

Petitioner's ineffective assistance of counsel claim is governed by the familiar two-prong test from *Strickland v. Washington*, 466 U.S. 668 (1984).   To prevail, Petitioner must show: (1) "counsel's representation fell below an objective standard of reasonableness," and (2) "the deficient performance prejudiced the defense."   *Strickland*, 466 U.S. at 687–88.

To establish prejudice, Petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."   *Id.* at 694.   A "reasonable probability" means "a probability sufficient to undermine the confidence in

the outcome." *Id.* When assessing prejudice, a court must consider the evidence that would

have been presented at trial but for an attorney's deficient performance along with the "the

totality of the evidence before the . . . jury." *Id.* at 695; *see also Blackmon v. Williams*, 823 F.3d

1088, 1106–07 (7th Cir. 2016). "If a petitioner 'makes an insufficient showing on one' prong of

the *Strickland* analysis, 'there is no reason for a court . . . to address both components of the

inquiry.'" *Thurston v. Vanihel*, 39 F.4th 921, 929 (7th Cir. 2022) (quoting *Strickland*, 466 U.S.

at 697).

     In Petitioner's case, the state appellate court correctly identified *Strickland* as the

governing standard for Petitioner's ineffective assistance claim. *See Wilmington*, 2015 WL

4936229, at *2 (citing *Strickland*'s two-prong standard). Therefore, the state court's decision

was not contrary to clearly established federal law. *See* 28 U.S.C. § 2254(d).

     The state appellate court further acknowledged that counsel "has an obligation to explore

and investigate a client's alibi defense" and "the failure to present available witnesses to

corroborate a defense" can constitute ineffective assistance. *See Wilmington*, 2015 WL

4936229, at *2. The court concluded, however, that Petitioner could not establish prejudice

because the alleged alibi would not have outweighed the overwhelming evidence of Petitioner's

guilt and would have directly contradicted Petitioner's secondary defense of second-degree

murder. *Id*. at *2–4. This conclusion was not unreasonable. *See* 28 U.S.C. § 2254(d).

     Petitioner's actions following McWilliams's murder call into question the reliability of

McCray's statement. As the state appellate court noted, Petitioner "voluntarily inserted himself

into the police investigation" by informing the police that Dollar was the murderer. *Wilmington*,

2015 WL 4936229, at *3; *see also* State Ct. Record (Dckt. No. 54-30, at 137–39, 143). When

later questioned about the veracity of this report, Petitioner did not present an alibi or inform the

police about McCray.   Instead, he tried implicating other people in the murder before eventually confessing to the crime.   *See* State Ct. Record (Dckt. No. 54-30, at 143–45).   It wasn't until eight years later, when Petitioner allegedly reunited with McCray in prison, that a detailed account of their evening at McCray's grandmother's home on the night of McWilliams's murder was memorialized and presented to the state courts.   *See* Petition for Writ of Habeas Corpus, at 7 (Dckt. No. 1).

As mentioned above, "'eleventh hour' affidavits containing facts not alleged at trial and accompanied by no reasonable explanation for delay are inherently suspect." *McDowell*, 737 F.3d at 484.   So, the Court notes that McCray's affidavit isn't particularly strong evidence that he was a viable alibi witness.

Nevertheless, even if Petitioner could demonstrate deficient performance, his ineffective assistance claim fails on *Strickland*'s prejudice prong.   Here, the state appellate court pointed to ample evidence presented at trial establishing Petitioner's guilt.   The detectives' testimony demonstrated that Petitioner initiated his own involvement in the murder investigation, providing false information to the police one week after the killing.   *See Wilmington*, 2015 WL 4936229, at *3.   Petitioner confessed to murdering McWilliams and disposing of his body in a garbage can after an argument ensued in which the victim threatened to expose Petitioner's involvement in the gay community.   *Id.*   Petitioner's admission that he feared such exposure was corroborated by both his gang affiliation and his decision to not videorecord his statement to prevent anyone from seeing him talk about "gay sex."   *See* State Ct. Record (Dckt. No. 54-35, at 140).

Additionally, the state appellate court noted that there was substantial evidence introduced at trial that supported the details of Petitioner's confession.   *See Wilmington*, 2015

WL 4936229, at *3.   McWilliams's injuries were consistent with Petitioner's description of the killing, including the physical evidence and the location of the body.   That evidence includes the trajectory of the bullets through the top of the victim's head, and the scratches and bruises from his body being dragged across the sidewalk.   *Id.*   It also includes the fact that McWilliams's body was found down the street from Petitioner's residence in a garbage can that was assigned to the vacant house across the alley from where Petitioner lived.   *Id.*

Given the weighty evidence demonstrating Petitioner's voluntary involvement in the murder investigation, corroborating his motive to kill, and supporting the specific details of Petitioner's confession, the state appellate court's rejection of Petitioner's ineffective assistance of counsel claim was not unreasonable.   *See Corcoran v. Neal*, 783 F.3d 676, 683 (7th Cir. 2015) ("Unreasonable [in the context of § 2254(d)] means more than just incorrect; it means something . . . lying well outside the boundaries of permissible differences of opinion.") (cleaned up).   The state court's decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."   *Harrington*, 562 U.S. at 103.   Accordingly, Claim IV is denied.

*     *     *

For the reasons stated above, this Court cannot grant federal habeas relief on any of Petitioner's claims.   The habeas corpus petition is denied.

### Certificate of Appealability and Notice of Appeal Rights

Petitioner is advised that this is a final decision ending his case in this Court.   If he wishes to appeal, he must file a notice of appeal in this Court within 30 days of the entry of judgment.   *See* Fed. R. App. P. 4(a)(1).   He need not bring a motion to reconsider this Court's ruling to preserve his appellate rights.   However, if he wishes the Court to reconsider its

judgment, he may file a motion under Rule 59(e) of the Federal Rules of Civil Procedure.   A

Rule 59(e) motion must be filed within 28 days of the entry of this judgment.   *See* Fed. R. Civ.

P. 59(e).   A Rule 59(e) motion also suspends the deadline for filing an appeal until the motion is

ruled upon.   *See* Fed. R. App. P. 4(a)(4)(A)(iv).

A motion for relief from final judgment under Rule 60(b) of the Federal Rules of Civil

Procedure will be construed as a second or successive habeas petition "so long as the motion

'attacks the federal court's previous resolution of a claim on the merits.'"   *Banister v. Davis*,

140 S. Ct. 1698, 1709 (2020) (quoting *Gonzalez v. Crosby*, 545 U.S. 524, 532 (2005)).   Section

2244(b) sets the requirements for second or successive habeas petitions.

A Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under

Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or

order.   *See* Fed. R. Civ. P. 60(c)(1).   A Rule 60(b) motion suspends the deadline for filing an

appeal until the Rule 60(b) motion is ruled upon only if filed within 28 days of the entry of

judgment.   *See* Fed. R. App. P. 4(a)(4)(A)(vi).   Neither the time to file a Rule 59(e) motion nor

the time to file a Rule 60(b) motion can be extended.   *See* Fed. R. Civ. P. 6(b)(2).

The Court declines to issue a certificate of appealability.   Petitioner cannot make "a

substantial showing of the denial of a constitutional right."   28 U.S.C. § 2253(c)(2).

Reasonable jurists would not debate, much less disagree with, this Court's resolution of

Petitioner's claims.   *See Arredondo v. Huibregtse*, 542 F.3d 1155, 1165 (7th Cir. 2008).

**Conclusion**

Petitioner's habeas corpus petition (Dckt. No. 1) is denied on the merits.   Any pending

motion is denied as moot.   The Court declines to issue a certificate of appealability.   The Clerk

is instructed to change the name of Respondent to Tarry Williams, the current Warden of the

Dixon Correctional Center, and enter judgment in favor of Respondent.   Civil case terminated.


Dated:  March 1, 2023

_____
Steven C. Seeger
United States District Judge